# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MIKHAIL KOKORICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0722-MTZ |
| | ) | |
| MOMENTUS INC., a Delaware Corporation, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 2, 2022
Date Decided: May 15, 2023

Eric Lopez Schnabel and Alessandra Glorioso, DORSEY & WHITNEY LLP, Wilmington, Delaware; Benjamin D. Greenberg and Todd S. Fairchild, DORSEY & WHITNEY LLP, Seattle, Washington, *Attorneys for Plaintiff Mikhail Kokorich*.

Joseph L. Christensen and Meghan M. Dougherty, CHRISTENSEN & DOUGHERTY LLP, Wilmington, Delaware; Perrie M. Weiner and Aaron T. Goodman, BAKER & MCKENZIE LLP, Los Angeles, California; Peter P. Tomczak and Michael D. Lehrman, BAKER & MCKENZIE LLP, Chicago, Illinois, *Attorneys for Defendant Momentus, Inc.*

**ZURN, Vice Chancellor.**

Plaintiff Mikhail Kokorich, a Russian national, is a co-founder, a former director, and the former CEO of defendant Momentus Inc. ("Momentus" or the "Company"). After government investigations launched concerning Kokorich's ownership and control of Momentus, and Momentus's intent to merge with a special purpose acquisition company, Kokorich resigned from his roles with the Company and entered into a separation agreement that placed his Momentus stock in a trust. To further appease regulators, he then agreed to sell his shares back to the Company. That stock repurchase agreement included a broad release of all his claims against the Company, except for a narrow subset of claims arising out of that agreement or other agreements executed in connection with it.

Other investigations and lawsuits followed, and Kokorich sought indemnification and advancement. The Company denied his requests, citing the release. Kokorich filed a complaint seeking indemnification and advancement under an indemnification agreement, other purported and actual agreements, Momentus's governing documents, and 8 *Del. C.* § 145(c), as well as fees and fees incurred in bringing this action. In the alternative, he seeks to recover under theories of promissory estoppel and fraudulent inducement. Momentus moved to dismiss his claims for lack of subject matter jurisdiction on the basis that his claims are subject to an arbitration provision. Alternatively, Momentus argues that Kokorich has failed

1

to state a claim under Court of Chancery Rule 12(b)(6) because he released his claims.

After concluding that there is no clear and unmistakable intent to submit the dispute over arbitrability to an arbitrator, I find the parties did not intend to arbitrate Kokorich's claims. From there, I conclude that Kokorich released all his claims under the indemnification agreement, other agreements, and Momentus's bylaws, as well as the promise on which he brings his claim for promissory estoppel. An anti-reliance clause also precludes Kokorich's promissory estoppel and fraudulent inducement claims. Further, he has failed to state a claim under Momentus's certificate of incorporation because he did not provide the Court with that document, or plead its contents: the Court has no idea what rights it provides.

I then address his claims under Section 145(c), concluding that he has failed to plead he was successful on the merits or otherwise with respect to the one completed proceeding. Finally, I dismiss as unripe his claim seeking a declaratory judgment that he did not release his Section 145(c) mandatory indemnification rights for other ongoing proceedings.

## I.    BACKGROUND

Momentus, a Delaware corporation, is "a space infrastructure company headquartered in San Jose, California."[1]   Kokorich was Momentus's co-founder, former CEO, and a former director, as well as an equity holder in the Company.[2] Although he currently resides in Switzerland, Kokorich is a Russian national.

In 2017, Kokorich and Momentus entered into an Indemnification Agreement that obligated Momentus to indemnify Kokorich "to the fullest extent permitted by law,"[3] and which "continue[s] thereafter so long as [Kokorich] shall be subject to" any proceeding covered by the agreement by reason of his status of an officer or director.[4]  It also provides for mandatory advancement rights.[5]  Section 7(d) of the Indemnification Agreement states that

> In the event that [Kokorich] . . . seeks a judicial adjudication of his rights under, or to recover damages for breach of, this Agreement, or to   recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on [Kokorich's] behalf, in advance, any and all expenses . . . actually and reasonably incurred by him in such judicial adjudication, regardless of

---

[1] Docket Item ("D.I.") 34, at Am. Compl. ¶¶ 10, 15 [hereinafter "Am. Compl."].

[2] Momentus was formerly named Space Apprentices Enterprise Inc.  Throughout this decision, I may refer to the Company as Momentus regardless of its name at the relevant time for purposes of clarity.

[3] Am. Compl. Ex. 1 § 1 [hereinafter "Indem. Agr."].

[4] Indem. Agr. § 10

[5] *Id.* § 5.

whether [Kokorich] ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery.[6]

The Amended and Restated Bylaws of Momentus Inc. dated February 13, 2020 (the "Bylaws") also provide for indemnification of directors and officers "to the maximum extent and in the manner permitted by the Delaware General Corporation Law,"[7] and mandatory advancement rights.[8]

### A. Kokorich Draws Regulatory Concern And Contracts With Momentus To Resolve It.

"To raise capital for its ongoing research and development, Momentus entered into an agreement in October of 2020 to merge with a publicly traded special purpose acquisition company called Stable Road Acquisition Corp[.] ('Stable Road')."[9] Additionally, that fall, "Momentus was also preparing for a planned test launch of its space vehicle."[10] Kokorich alleges that "[b]oth the merger and planned test launch were important for the Company's survival and success."[11]

But in January of 2021, the Office of the Under Secretary of Defense notified the SEC of concerns regarding "foreign ownership and control of Momentus."[12]

---

[6] *Id.* § 7(d).

[7] Am. Compl. Ex. 2 § 6.1.

[8] *Id.* § 6.3.

[9] Am. Compl. ¶ 17.

[10] *Id.*

[11] *Id.* ¶ 18.

[12] *Id.*

This prompted an SEC investigation into the Company's planned merger with Stable Road.[13] The government scrutiny "threatened the pending merger and Momentus' ability to obtain regulatory approvals for the planned test launch of its space vehicle."[14] This attention also put Momentus in the crosshairs of the Committee on Foreign Investments in the United States ("CFIUS"), which informed Momentus it was investigating the Company due to "national security concerns as a result of foreign control and ownership of Momentus by Mr. Kokorich."[15]

To address CFIUS's concerns, Kokorich resigned as a Company officer and director, and he and Momentus entered into a separation agreement on February 11, 2021 (the "Separation Agreement").[16] Under that agreement, Kokorich transferred his Company equity to a trust.[17] In Section 24 of the Separation Agreement, the Company promised to reimburse Kokorich up to $500,000 for legal fees and expenses relating to certain matters, including SEC or CFIUS investigations concerning the divestment of his Momentus stock.[18]

---

[13] *Id.* "The investigation focused on, among other things, alleged statements made, and actions taken by Momentus' representatives (including Mr. Kokorich as an officer and director of Momentus), as well as Momentus' merger partner, Stable Road." *Id.* ¶ 45.

[14] *Id.* ¶ 18.

[15] *Id.* ¶¶ 20, 43.

[16] *Id.* ¶ 21; *id.* at Ex. 3 [hereinafter "Sep. Agr."].

[17] Sep. Agr. § 1, 5.

[18] *Id.* § 24.

The Separation Agreement references Momentus's governing documents and the Indemnification Agreement in language that Kokorich would later rely on to preserve his rights under those documents. Kokorich released certain employment-related claims against the Company, but the release did not apply to Kokorich's rights under the Indemnification Agreement or "the Company's internal governing documents."[19] The Separation Agreement clarified that "nothing herein nor the termination of [Kokorich's] employment with the Company in any way limits, waives or otherwise modifies [Kokorich's] obligations or the Company's rights" under the Indemnification Agreement, and specified "the Indemnification Agreement shall remain in full force and effect in accordance with, and only to the extent permitted by, its terms."[20]

But the Separation Agreement did not fully alleviate CFIUS's concerns. To assuage CFIUS, Kokorich and Momentus worked toward a stock repurchase agreement, which would provide for Momentus's purchase of Kokorich's shares held in trust (the "Stock Repurchase Agreement"), and a national security agreement with the United States government (the "National Security Agreement").[21]

### B. Kokorich Incurs Legal Fees And Requests Additional Indemnification Under The Separation Agreement.

---

[19] *Id.* § 6.

[20] *Id.* § 12.

[21] Am. Compl. ¶ 27; *id.* at Exs. 8 [hereinafter "SRA"] & 7.

Another governmental investigation was initiated in May, and Kokorich wanted assurances that the Company would honor its obligations under the Indemnification Agreement with respect to that investigation. On May 27, Kokorich and the Company entered into a letter agreement by which Momentus agreed to advance Kokorich expenses relating to that investigation (the "May 27 Agreement").[22] The May 27 Agreement specified that any advancement made under the agreement was in accordance with the Indemnification Agreement.[23]

Meanwhile, the SEC investigation continued, and the Company and Kokorich continued negotiating the Stock Repurchase Agreement and National Security Agreement. Legal fees accumulated and exceeded the sums Kokorich was entitled to under the Separation Agreement. Kokorich threatened to stop working on both the agreements and the investigation. Between May 20 and June 7, Kokorich and the Company discussed the terms of a letter agreement by which the amount reimbursable under the Separation Agreement would be increased by $250,000.

### C.     Kokorich Releases Claims Against Momentus.

On June 8, Kokorich and Momentus executed the Stock Repurchase Agreement and the National Security Agreement. The Stock Repurchase Agreement

---

[22] Am. Compl. Ex. 10.

[23] *Id.* § 1.

provided Momentus would purchase Kokorich's equity interest in the Company.[24]

As "partial consideration," Kokorich agreed to a release (the "Release"):

> [Kokorich] knowingly and voluntarily releases the Company and its Related Parties (each, a "Company Released Party") to the maximum extent permitted by applicable law from any and all claims, demands, causes of action, obligations, damages, losses, liabilities, promises, debts, costs and expenses of any kind whatsoever, whether at law or in equity, asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims"), which Mr. Kokorich . . . may have or may claim to have against any Company Released Party arising from or relating to any events, facts, conditions or circumstances existing or arising on or prior to the date hereof, in each case, to the extent related to the Company, including without limitation, Claims that arise from or relate to Mr. Kokorich's . . . prior relationship with the Company, Mr. Kokorich's . . . rights or status as an equityholder, employee, officer or director of the Company.[25]

The Release excludes "any Claims Mr. Kokorich . . . may have under this Agreement and any of the other agreements executed and delivered in connection herewith" (the "Carveout").[26] The Stock Repurchase Agreement also includes an anti-reliance clause and an integration clause.[27]

---

[24] SRA § 1.

[25] *Id.* § 5(a).

[26] *Id.*

[27] *Id.* § 3(f) ("Each of Mr. Kokorich . . . hereby acknowledges that [he] has not relied on any representation or statement of the Company, other than those set forth in this Agreement, in making its decision to enter into this Agreement[.]"); *id.* § 6(f) ("Except as expressly set forth herein, this Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.").

### D. Kokorich Incurs More Legal Fees And Sues For Indemnification And Advancement.

In the months that followed, an SEC lawsuit and multiple class action complaints were filed against the Company and Kokorich. Kokorich "made numerous requests for overdue payments, and submitted in excess of 15 invoices to Momentus for work performed on Mr. Kokorich's behalf in relation to the [various proceedings], totaling over $800,000."[28] Momentus refused to indemnify him or advance expenses.

Kokorich filed his first complaint in this action on August 16, 2022,[29] and an amended complaint (the "Amended Complaint") on November 14.[30] The Amended Complaint includes nine counts, through which Kokorich seeks advancement and indemnification from five sources: the Indemnification Agreement; the May 27 Agreement; 8 *Del. C.* § 145(c); Momentus's Certificate of Incorporation (the "Charter");[31] and the Bylaws.[32] Through the nine counts, Kokorich seeks a mix of relief, including declaratory judgments that he has rights to advancement and indemnification in connection with both completed and ongoing proceedings; advancement relating to ongoing proceedings; indemnification for the CFIUS

---

[28] Am. Compl. ¶ 52.

[29] D.I. 1.

[30] Am. Compl.

[31] Kokorich has not provided the Court with a copy of the Charter.

[32] Am. Compl. Ex. 2.

Investigation, which is the only proceeding that has been completed to date; and fees on fees.[33]

Momentus moved to dismiss under Court of Chancery Rule 12(b)(1) for lack of subject matter jurisdiction, and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[34] It contends that the Separation Agreement's arbitration provision mandates dismissal, and that Kokorich released all his claims by signing the Stock Repurchase Agreement. The parties briefed Momentus's motion[35] and I heard argument on February 2.[36]

## II.   ANALYSIS

I begin with the threshold question of whether this Court has subject matter jurisdiction.[37] After concluding that the Separation Agreement's arbitration provision does not divest this Court of jurisdiction, I address Momentus's motion under Rule 12(b)(6). I find that because certain claims are released, and because Kokorich has not achieved success on the merits or otherwise concerning the CFIUS

---

[33] Am. Compl. ¶¶ 58–98.

[34] D.I. 41, at Motion to Dismiss. Unfortunately for the Court, Momentus incorporated briefing on its motion to dismiss Kokorich's first complaint to the extent those briefs made arguments under Rule 12(b)(1). D.I. 29, at Opening Br.; D.I. 40.

[35] D.I. 49 [hereinafter "PAB"]; D.I. 53, at Reply Br.

[36] D.I. 56; D.I. 59.

[37] *In re Doehler Dry Ingredient Sols., LLC*, 2022 WL 4281841, at *3 (Del. Ch. Sept. 15, 2022) (referring to subject matter jurisdiction as a "threshold issue"), *aff'd sub nom. In re Dissolution of Doehler Dry Ingredient Sols., LLC*, 2023 WL 2506401 (Del. Mar. 14, 2023).

Investigation, most of his contractual and statutory indemnification and advancement claims must be dismissed. The promise on which his promissory estoppel claim is based was released, and that claim and his fraudulent inducement claim are precluded by the Stock Repurchase Agreement's anti-reliance clause. His remaining statutory claim, which seeks a declaration that he has not released his Section 145(c) indemnification claims for ongoing proceedings, is dismissed as unripe.

Among other sources, Kokorich seeks indemnification under the Indemnification Agreement and Bylaws. To sidestep the Release in the Stock Repurchase Agreement, his route to relief under the Indemnification Agreement and Bylaws, is based on a daisy chain of other agreements and correspondence. He begins by asserting Momentus's counsel's emails or a board resolution constitute an acceptance of a proposed amendment to the Separation Agreement. From there, he argues that the Separation Agreement as amended constitutes one of the "other agreements executed and delivered in connection" with the Stock Repurchase Agreement, and was therefore carved out from the Release. With the Separation Agreement carved out, he points to the Separation Agreement's language stating that the Indemnification Agreement "shall remain in full force and effect," and that the Separation Agreement's release did not apply to the Indemnification Agreement or the Bylaws. He concludes the parties intended the Indemnification Agreement and

11

Bylaws to survive the Release.  If correct, this theory allows Kokorich to obtain advancement and indemnification for any claims brought against him by reason of the fact he was a Momentus officer or director, regardless of the Release.

### A.    This Court Has Subject Matter Jurisdiction Over Kokorich's Claims.

Momentus argues that because the Separation Agreement is one of the links in Kokorich's daisy chain, the Court must dismiss this action due to the Separation Agreement's arbitration provision.   The Separation Agreement provides for arbitration of all disputes "arising out of, or relating to, this Agreement, or its interpretation, enforcement, breach, performance or execution . . . conducted under the Judicial Arbitration and Mediation Services (JAMS) Streamlined Arbitration Rules & Procedures."[38]   In contrast, the Indemnification Agreement provides that "any action or proceeding arising out of or in connection with [the Indemnification Agreement]" must be litigated in the Court of Chancery.[39]   The Bylaws are silent as to whether Kokorich's claims should be arbitrated or brought in court.[40]   Kokorich

---

[38] Sep. Agr. § 19.

[39] Indem. Agr. § 20.

[40] Kokorich argues Section 6.6 of the Bylaws mandates that claims arising thereunder be litigated in court.  Section 6.6 provides that "[n]o indemnification or advance shall be made under this Article VI, except where such indemnification or advance is mandated by law or the order, judgment or decree of any court of competent jurisdiction, in any circumstance where (1) it appears" that such payments would be inconsistent with the Charter, Bylaws, or a stockholder resolution, or (2) where such payment "would be inconsistent with any condition expressly imposed by a court in approving a settlement."  Am. Compl. Ex. 2

argues that he is seeking indemnification and advancement under the Indemnification Agreement and Bylaws, not the Separation Agreement, and that the Separation Agreement is relevant only to the extent that it demonstrates he maintains rights under the Indemnification Agreement and the Bylaws.

I begin with the threshold question of who should decide whether Kokorich's claims are arbitrable. "The court presumes that parties intended courts to decide issues of substantive arbitrability."[41] But where the agreement at issue demonstrates "a clear and unmistakable intent to submit arbitrability issues to an arbitrator," this Court will dismiss or stay the action in favor of arbitration.[42] If multiple dispute resolution provisions are in conflict, the Court will determine the question of substantive arbitrability.[43]

Kokorich's theory carving his claims out of the Release relies on both a purported amendment to the Separation Agreement and the Separation Agreement's references to the Indemnification Agreement and Bylaws. To the extent Kokorich's route to relief under the Indemnification Agreement relies on interpreting language

---

§ 6.6. None of the circumstances requiring a court order under Section 6.6 are present here. The Bylaws do not specify whether this dispute was meant to be litigated in court or in arbitration.

[41] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).

[42] *Id.* at 80.

[43] *UPM-Kymmene Corp. v. Renmatix, Inc.*, 2017 WL 4461130, at *6–7 (Del. Ch. Oct. 6, 2017); *AffiniPay, LLC v. West*, 2021 WL 4262225, at *5 (Del. Ch. Sept. 17, 2021).

in the Separation Agreement, the Separation Agreement's arbitration provision conflicts with the Indemnification Agreement's forum selection clause governing his claim for indemnification. As for the Bylaws, their silence on the issue of dispute resolution leads to a presumption that the parties intended for a court to resolve questions of substantive arbitrability.[44] These conflicts with the Separation Agreement's arbitration provision preclude a finding that the parties intended an arbitrator to decide substantive arbitrability. The Court must decide the question of substantive arbitrability.

To resolve that question, I must determine whether the parties intended for the claims at issue to be arbitrated.[45] "When contracting parties provide for the arbitration of claims in their agreement, the arbitration provision, no matter how broadly drafted, can reach only the claims within the scope of the contract."[46] A

---

[44] *See Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *11–13 (Del. Ch. Jan. 17, 2007); *UPM-Kymmene*, 2017 WL 4461130, at *6 ("In *Hough Associates* . . . the Court quickly discerned the absence of a clear and unmistakable intention to have an arbitrator decide issues of substantive arbitrability when the contract containing the arbitration clause was in obvious tension with the contract(s) that formed the basis of the claims."); *W. IP Commc'ns, Inc. v. Xactly Corp.*, 2014 WL 3032270, at *7 (Del. Super. June 25, 2014) ("Where an agreement is silent as to who decides substantive arbitrability, it is presumed that the parties intended for the courts to resolve substantive arbitrability issues, absent 'clear and unmistakable' evidence to the contrary." (quoting *Willie Gary*, 906 A.2d at 79)); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, 2011 WL 1348438, at *16 (Del. Ch. Apr. 8, 2011) ("Because courts presume that the parties did not agree to submit substantive arbitrability issues to the arbitrator, if the contract is silent or ambiguous, the court will decide arbitrability.")

[45] *See AffiniPay*, 2021 WL 4262225, at *8–10.

[46] *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 151 (Del. 2002).

party will not be required to arbitrate a claim if the claim could be brought even if the parties had not entered into the agreement requiring arbitration.[47]  Here, Kokorich is enforcing his rights under the Indemnification Agreement and the Bylaws.  The merits of his claims have no relationship to the Separation Agreement.  The Separation Agreement became relevant only after Momentus raised the affirmative defense of release, and Kokorich responded by arguing the Separation Agreement pushes his claims under the other agreements within the scope of the Carveout.  The parties did not intend to arbitrate Kokorich's claims:  they do not "bear on the duties and obligations under the" Separation Agreement, and they do not "touch on the rights and performance related to" that agreement.[48]  Thus, this Court has subject matter jurisdiction over all of Kokorich's claims.[49]

## B.    Kokorich Has Failed To State A Claim.

Having found the Separation Agreement's arbitration provision did not divest this Court of subject matter jurisdiction over Kokorich's claims for indemnification

---

[47] *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 583 (Del. Ch. 2006).

[48] *Parfi*, 817 A.2d at 156.

[49] Momentus also appears to argue that Kokorich's claims for indemnification under the Charter, and 8 Del. C. § 145(c), arise out of or relate to the Separation Agreement.  I find these claims have no relationship to the Separation Agreement and therefore are not subject to arbitration under that agreement.  Similarly, Kokorich's claims for promissory estoppel and fraudulent inducement rely on the Separation Agreement no more than his claims under the Indemnification Agreement or the Bylaws; they are likewise not subject to arbitration.

and advancement, I now turn to Momentus's motion under Rule 12(b)(6). The governing standard is familiar:

> (i) [A]ll well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[50]

But where a plaintiff seeks advancement or indemnification pursuant to a mandatory provision, the company bears the burden of demonstrating that such advancement or indemnification is not required.[51]

Kokorich seeks mandatory indemnification or advancement from five different sources: the Indemnification Agreement; the May 27 Amendment; the Bylaws; the Charter; and 8 *Del. C.* § 145(c). Alternatively, he seeks to recover under theories of promissory estoppel and fraudulent inducement. Momentus primarily argues that he is not entitled to indemnification or advancement from any of those sources because his claims fall within the Release's scope; Kokorich responds they fall within the Carveout. I find that Kokorich released his claims under the

---

[50] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes omitted) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[51] *Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *13 (Del. Ch. July 14, 2009) (explaining a mandatory indemnification provision places the burden on the "party from whom indemnification is sought to prove that indemnification is not required"); *Krauss v. 180 Life Scis. Corp.*, 2022 WL 665323, at *4 (Del. Ch. Mar. 7, 2022) ("When advancement is mandatory, the company carries the ultimate burden of proving that advancement is not required.").

Indemnification Agreement, including his claim for fees on fees, as well as his claims under the May 27 Agreement and the Bylaws. His claims for promissory estoppel and fraudulent inducement fail as a matter of law. His claims under the Charter fail because he has not provided that document to the Court and does not plead its contents or his rights thereunder. I also find that Kokorich has not achieved success on the merits or otherwise with regard to the CFIUS Investigation, and therefore is not entitled to mandatory indemnification under 8 *Del. C.* § 145(c). Finally, the remainder of his claim seeking a declaration that he has not released his claims under Section 145(c) with respect to other ongoing proceedings is dismissed as unripe.

       **1.    Kokorich's Claims Under The Indemnification Agreement And The Bylaws Do Not Fall Within The Scope Of The Carveout.**

Momentus argues that Kokorich released his claims. Kokorich relies on his daisy chain of documents and amendments to argue his claims fall into the Carveout. In evaluating whether Kokorich is entitled to indemnification or advancement under the Indemnification Agreement and Bylaws, I begin with the first daisy in Kokorich's chain: a purported amendment to the Separation Agreement. Kokorich argues that during the negotiations between May 20 and June 7, the Company accepted an offer to amend the Separation Agreement. A more detailed summary of those discussions follows.

17

On May 20, Kokorich's counsel emailed Momentus's counsel, Jeanine McGuinness, conveying that Kokorich would not sign the Stock Repurchase Agreement or the National Security Agreement "unless Momentus agreed to amend the Separation Agreement to increase the contemplated legal fees by $250,000, and would continue to honor its indemnification obligations going forward."[52] The next day, on May 21, McGuinness emailed Kokorich's counsel: "I received confirmation that the company will agree to the requested increase in legal fees ($250,000)."[53]

On May 28, Kokorich's counsel responded by requesting that McGuinness "have Momentus prepare a short agreement documenting this approval for [Kokorich]'s records."[54] He also included proposed language "for [her] consideration."[55] McGuinness replied, "Will do, Justin."[56] The parties continued to draft and negotiate the Stock Repurchase Agreement and the National Security Agreement.

On June 7, 2021, Momentus's Board of Directors passed a board resolution approving the $250,000 increase to the amount reimbursable under the Separation Agreement (the "Board Resolution"), which provided:

---

[52] Am. Compl. ¶ 28; *see also id.* Ex. 5 at 3.

[53] Am. Compl. Ex. 5 at 1.

[54] *Id.*

[55] *Id.*

[56] *Id.*

18

> [T]he Authorized Officers hereby are, and each of them acting singly is, authorized and directed to execute and deliver the Letter Agreement on behalf of the Company, with such modifications and amendments as either of them may, in their discretion, determine to be necessary or advisable, such determination to be conclusively evidenced by the execution and delivery of the Letter Agreement by either of the Authorized Officers . . . .[57]

McGuinness emailed Kokorich's counsel the language of the Board Resolution the same day.[58] The paper trail ended there.

Kokorich asserts McGuinness, on behalf of the Company, accepted an offer to amend the Separation Agreement through her May 21 email, which was "confirmed" by her May 28 email and the Board Resolution.[59] Kokorich also appears to argue that the Company accepted an offer to amend the Separation Agreement through McGuinness's May 28 email and the Board Resolution.[60] Momentus disputes that the Company agreed to amend the Separation Agreement.

---

[57] Am. Compl. Ex. 6. Neither "Authorized Officers" nor "Letter Agreement" were defined in the resolution or elsewhere in the pleadings.

[58] *Id.*

[59] PAB at 30 ("This agreement was further confirmed by the parties' May 28, 2021 emails and the June 7, 2021 Board Resolution.").

[60] *Id.* at 29 ("Initially, the Court can readily find that the collective whole of the parties' May 2021 emails, and the June 7, 2021 Momentus Board Resolution, formed a binding agreement to the one material term for the Second Amendment to the Separation Agreement. As discussed below, these communications were executed and delivered in connection with the Stock Repurchase Agreement."); *id.* at 31 ("What was needed to give validity to an agreement or to put it into effect was objective manifestation of assent to the essential terms of the agreement, which was achieved via the parties' May 2021 emails and confirmed in Momentus' Board Resolution.").

Under our law, "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[61]  In determining whether one has accepted an offer such that they intended to be bound, our inquiry is objective: "whether a reasonable man would, based upon the 'objective manifestation of assent' and all of the surrounding circumstances, conclude that the parties intended to be bound by contract."[62]  Even where the parties are aligned as to certain terms, or may agree in fact, an acceptance still requires the essential intention to be bound.[63]

The plain language of McGuinness's May 21 email conveys that the Company did not intend to accept an offer to amend the Separation Agreement.  Rather, by writing that the Company "will agree," McGuinness conveyed that the Company would accept the offer at some point in the future.  A promise to accept an offer at

---

[61] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1212–13 (Del. 2018) (internal quotation marks omitted) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

[62] *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986); *see also Sheets v. Quality Assured, Inc.*, 2014 WL 4941983, at *2 (Del. Super. Sept. 30, 2014) ("A contract is formed when it is reasonable to conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all essential terms."); 1 Richard A. Lord, *Williston on Contracts* § 4:1 (4th ed. May 2023 update) [hereinafter "*Williston on Contracts*"] ("Thus, as a threshold condition for contract formation, there must be an objective manifestation of voluntary, mutual assent.").

[63] *See VS&A Commc'ns P'rs, L.P. v. Palmer Broad. Ltd. P'ship*, 1992 WL 339377, at *10 (Del. Ch. Nov. 16, 1992) (applying New York law and concluding:  "What is critical in this case is not whether the parties had *in fact* reached agreement on all material terms of a sale or not.  What is critical is whether the parties reached an agreement to be bound with respect to those material terms.").

some undefined point in the future does not evince a present intent to be bound.[64]

At best, McGuinness's email conveyed a promise to accept a later offer[65] or signaled that the parties were aligned as to the terms of any future agreement.[66] Neither is sufficient to bind the Company.

The circumstances surrounding this correspondence further support the conclusion that McGuinness's email did not convey a present intent to be bound. The Separation Agreement provides that it may be modified only in a writing signed

---

[64] *See* 2 *Williston on Contracts* § 6:10 ("[T]he question is whether the signals sent by the offeree to the offeror objectively manifest the former's intent to be presently bound, an acceptance which is merely contemplated in the future is no acceptance at all."); 1 E. Allan Farnsworth & Zachary Wolfe, *Farnsworth on Contracts* § 3.16, at 3-107 (4th ed. 2019) [hereinafter *"Farnsworth on Contracts"*] ("The offeree's promise to accept at some later time (a promise to make a promise) is not an acceptance, because it is conditional on a further step to be taken by the offeree at that time."); 17 C.J.S. *Contracts* § 65 ("An acceptance concludes the making of a contract; nothing further is required."); *see also Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000) ("It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.").

[65] *James Cable, LLC v. Millennium Digital Media Sys., L.L.C.*, 2009 WL 1638634, at *5 (Del. Ch. June 11, 2009) ("*Black's Law Dictionary* defines a promise as '[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something.'" (alteration in original) (quoting Black's Law Dictionary 1249 (8th ed. 2004))); *see also Am. Univ. v. Todd*, 1 A.2d 595, 597 (Del. Super. 1938) ("A promise, which is made conditionally on the will of a promisor, is generally of no value, for one who promises to do a thing, only if it pleases him to do it, is not bound to perform it at all." (citation omitted) (internal quotation marks omitted)).

[66] *See VS&A*, 1992 WL 339377, at *10 (applying New York law and concluding that expressing agreement in fact as to contractual terms is not the same as a legally binding acceptance).

by both parties.[67]  The parties previously amended the Separation Agreement, three months earlier, and they abided by this language and executed a separate writing.[68] This supports the conclusion that the Company did not agree to be bound at present: by writing the Company "will agree," McGuinness was conveying that the Company would later prepare and execute a binding amendment, or that it would sign a written agreement to amend the Separation Agreement.[69]  A May 28 email from Kokorich's counsel is consistent with the understanding that an agreement needed to be prepared and signed.[70]  The requirement for future action—here, actual acceptance— precludes a finding that the parties entered into a contract on May 21.[71]

---

[67] Sep. Agr. § 20.

Kokorich argues that a provision requiring an agreement to be amended only in writing can be modified or waived.  He is correct.  *See Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972).  But the parties' conduct here, including their modification of the Separation Agreement in writing just a few months prior, shows that they did not intend to waive or modify this provision.  *See* Am. Compl. Ex. 4 (written agreement to amend the Separation Agreement); *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1229 (Del. Ch. 2000) (declining to find a waiver of a provision requiring written amendments where the parties previously "reduce[d] a modification to writing").  I cannot find such a waiver here based solely on the fact that the parties did not sign a written amendment to the Separation Agreement.

[68] Am. Compl. Ex. 4.

[69] Kokorich has not raised any argument that this response was a preliminary agreement or an agreement-to-agree; any such good faith argument is waived.  *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[70] Am. Compl. Ex. 5 at 1.

[71] *See Ramone v. Lang*, 2006 WL 905347, at *11 (Del. Ch. Apr. 3, 2006) ("Since acceptance is the ultimate step in making a contract, the commitment cannot be conditioned on some final step to be taken by the offeror." (internal quotation marks omitted) (quoting

The Board Resolution likewise does not constitute an acceptance of the proposed amendment, nor did it "further confirm[]" that the earlier emails accepted an offer.[72] On the contrary, it confirms that the Company did not intend to be bound by McGuinness's May 21 email, and instead contemplated entering into an agreement at a later date. The Board Resolution directed the "Authorized Officers" to "execute and deliver the Letter Agreement on behalf of the Company," and make any such modifications and amendments that they believed "necessary or advisable."[73] Rather than an unconditional acceptance, this resolution empowered Company officers to proceed in whatever manner they thought best, including accepting the offer by papering and executing a letter agreement or making a counteroffer, which implies that management was free to negotiate with Kokorich further.[74] Because any possible acceptance arising from the Board Resolution was conditioned on management preparing an agreement, the resolution itself could not

---

E. Allen Farnsworth, *Farnsworth on Contracts* § 3.13, at 273 (3d ed. 2004))); 1 *Farnsworth on Contracts* § 3.16, at 3-101 ("[A]cceptance is the final step in the making of a contract.").

[72] PAB at 30.

[73] Am. Compl. Ex. 6.

[74] *See Ramone*, 2006 WL 905347, at *11 (reasoning that additional "negotiations on substantive issues demonstrate that an enforceable contract . . . was not in place"); *Leeds*, 521 A.2d at 1102 ("Until it is reasonable to conclude, in light of all of these surrounding circumstances, that all of the points that the parties themselves regard as essential have been expressly or (through prior practice or commercial custom) implicitly resolved, the parties have not finished their negotiations and have not formed a contract.").

constitute the acceptance of an offer.[75]  And the fact that McGuinness sent an email attaching the relevant parts of the Board Resolution without sending the referenced letter agreement is further evidence that there was still more to do before the parties entered into a binding agreement.

Finally, the Amended Complaint concedes that the letter agreement referenced in the Board Resolution was never presented to or signed by Kokorich.[76] For any agreement to fall within the Carveout, it must be "executed and delivered in connection" with the Stock Repurchase Agreement.[77]  Kokorich has not argued that the agreement was "delivered" to him.  Thus, even if I were to accept Kokorich's argument that the amendment or an agreement to amend the Separation Agreement was executed, there is no basis to conclude that the agreement referenced in the Board Resolution was "delivered."  I cannot conclude that an amendment to the Separation Agreement was "executed and delivered" as the Carveout requires.[78]

---

[75] *See Jackson v. Nocks*, 2018 WL 1935961, at *6 (Del. Ch. Apr. 24, 2018) (explaining that a valid acceptance "must not be conditional on any further act by either party" (internal quotation marks omitted) (quoting *Ramone*, 2006 WL 905347, at *11)).

[76] Am. Compl. ¶ 31 n.2.

[77] SRA § 5(a) (excepting from the Release "any Claims Mr. Kokorich . . . may have under this Agreement and any of the other agreements executed and delivered in connection herewith").

[78] *Id.*; *Deliver*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/determine (last visited May 9, 2023) (defining "deliver" as "to send, provide, or make accessible to someone electronically").

Accordingly, neither McGuinness's emails nor the Board Resolution constitute an acceptance of an offer to amend the Separation Agreement, and no such amendment was "executed and delivered in connection" with the Stock Repurchase Agreement. And so, Kokorich's theory fails on its first and second steps. It follows he cannot contend the Separation Agreement's reference to the Indemnification Agreement and Bylaws carves claims arising under those agreements out of the Release.

Lastly, I interpret Momentus's argument that Kokorich released his claims under the Indemnification Agreement to encompass Count VII's claim for fees on fees under that agreement.[79] Kokorich provides no reason why these claims should be treated any differently from his other claims seeking advancement and indemnification. They likewise fall outside the Carveout's scope, and were released.

### 2. The Indemnification Agreement And The Bylaws Offered Contractual Mandatory Rights Subject To Release.

Kokorich argues that if his claims under the Indemnification Agreement and Bylaws do not fall within the scope of the Carveout, the Release is nevertheless insufficient because those agreements incorporated statutory rights to indemnification, and waiving statutory rights requires a clear and affirmative waiver. Both the Indemnification Agreement and Bylaws make mandatory the permissive

---

[79] Am. Compl. at 44.

indemnification and advancement rights found in DGCL Sections 145(a), (b), and (e).[80] But Sections 145(a) and (b) do not provide a statutory right to indemnification: those sources are enabling and simply explain what rights a corporation can offer.[81] Where a director or officer is not successful on the merits or otherwise, there is no statutory right to indemnification.[82] There is likewise no statutory right to advancement—Section 145(e) merely provides that a corporation may provide advancement to directors or officers.[83] Any mandatory rights to indemnification or advancement derived from Section 145 Kokorich has or had are thus contractual under the Indemnification Agreement and Bylaws, not statutory.[84] The release of

---

[80] Indem. Agr. §§ 1, 5; Am. Compl. Ex. 2 §§ 6.1, 6.3; *see Homestore, Inc. v. Tafeen*, 888 A.2d 204, 212 (Del. 2005) (reasoning the language "shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the Delaware General Corporation Law" created "a mandatory right of indemnification and an unconditional mandatory right to advancement" (internal quotation marks omitted) (citation omitted)).

[81] *Marino v. Patriot Rail Co.*, 131 A.3d 325, 333, 339 (Del. Ch. 2016); *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 81 (Del. 1998) ("Section 145(a) authorizes, but does not require, indemnification in connection with third-party actions.").

[82] *See Hermelin v. K-V Pharm. Co.*, 54 A.3d 1093, 1105 (Del. Ch. 2012); *cf. Tafeen*, 888 A.2d at 212 ("The right to indemnification requires 'success on the merits or otherwise' in defending proceedings brought under section 145(a) or (b)." (quoting 8 *Del. C.* § 145(c)).

[83] 8 *Del. C.* § 145(e) (providing that advancement "may be paid by the corporation").

[84] *Gentile v. SinglePoint Fin., Inc.*, 787 A.2d 102, 106 (Del. Ch. 2021) ("[I]t has become common corporate practice to adopt mandatory indemnification and advancement provisions. Where such a mandatory provision exists, the rights of potential recipients of such advancements will be enforced as a contract." (footnote omitted)), *aff'd*, 788 A.2d 111 (Del. 2001); *see also In re Delta Hldgs., Inc.*, 2004 WL 1752857, at *7 (Del. Ch. July 26, 2004) ("Claims arising under the express terms of a certificate of incorporation are contract-based claims."); *Tafeen v. Homestore, Inc.*, 2004 WL 3053129, at *3 (Del. Ch. Oct. 27, 2004) (referring to indemnification and advancement rights set forth in bylaws as

26

these indemnification and advancement rights does not implicate the same policy

concerns present when a defendant argues that one has released or waived mandatory

statutory rights.[85] To the extent Kokorich's claims overlap with the mandatory rights

to indemnification as set forth in Section 145(c), such policy concerns are likewise

not implicated because he has brought, and maintained, a separate claim under

Section 145(c). Kokorich's claims under the Indemnification Agreement and

Bylaws are contractual and may be released, like any other contractual right. Those

claims were released. Kokorich makes no other argument against dismissal of his

claims under these agreements.

### 3. Kokorich's Claims For Promissory Estoppel And Fraudulent Inducement Fail.

Kokorich also seeks to recover based on McGuinness's emails and the Board

Resolution under theories of promissory estoppel and fraudulent inducement.

Kokorich argues that statements in those documents induced him to enter into the

Stock Repurchase Agreement and the National Security Agreement, or that he relied

on them in entering into those agreements. Momentus counters that Kokorich cannot

bring a promissory estoppel claim because a contract governs the relationship

---

"contractual"), *aff'd*, 888 A.2d 204 (Del. 2005); *Salaman v. Nat'l Media Corp.*, 1994 WL 465534, at *1 (Del. Super. July 22, 1994) (referring to claim for indemnification under bylaws as "contractual").

[85] *See, e.g.*, *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1217–26 (Del. 2021) (evaluating whether a stockholder can waive her appraisal rights).

between the parties; or that if he could bring that claim, he released it. Momentus also argues that an anti-reliance clause in the Stock Repurchase Agreement precludes his promissory estoppel and fraud claims.

To plead a promissory estoppel claim,

> a plaintiff must prove by clear and convincing evidence that: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[86]

Kokorich argues the Release does not cover his claim because it accrued after he signed the Stock Repurchase Agreement, when the Company broke its purported promise to amend the Separation Agreement. According to Kokorich, because his claim had not accrued at the time he signed the Stock Repurchase Agreement, it could not have been released. Even if Kokorich is correct as to when his claim accrued, this argument ignores that the plain language of the Release expressly addresses any "promises" made by Momentus.[87] Specifically, the Release encompassed any "promises . . . of any kind whatsoever . . . known or unknown,

---

[86] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 876 (Del. 2020) (quoting *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 347–48 (Del. 2013)).

[87] SRA § 5(a).

suspected or unsuspected, fixed or contingent."[88] The purported promises predated the Release, and therefore fall within its scope.

Kokorich's argument fails for an additional reason. The Stock Repurchase Agreement included an anti-reliance clause, through which Kokorich acknowledged he "has not relied on any representation or statement of the Company, other than those set forth in this Agreement, in making its decision to enter into this Agreement."[89] Such anti-reliance clauses are enforceable and will preclude a finding of reasonable reliance on extra-contractual representations.[90] Here, the anti-reliance clause precludes any argument that Kokorich reasonably relied on extra-contractual representations made by the Company or its agents.[91]

The Amended Complaint also asserts an alternative claim of fraudulent inducement, which is based on the theory that he relied on statements Momentus's counsel made over the phone, McGuinness's emails, and the Board Resolution in

---

[88] *Id.*

[89] *Id.* § 3(f).

[90] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1056–57 (Del. Ch. 2006) (citing *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544 (Del. Ch. 2001); and *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129 (Del. Ch. 2003); and *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004); and *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382 (Del. Ch. July 9, 2002)).

[91] *See id.*; *see also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142–143 & n.18 (Del. Ch. 2004) ("The Court of Chancery has consistently held that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract.").

signing the National Security Agreement and Stock Repurchase Agreement. The elements of fraudulent inducement are: "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages."[92] Like his claim for promissory estoppel, the anti-reliance clause precludes Kokorich's argument that he reasonably relied on any extra-contractual representations.[93]

In briefing, Kokorich attempts to recast his pled fraudulent inducement claim as one for fraudulent concealment in an apparent effort to circumvent the anti-reliance clause. The Amended Complaint expressly pleads a claim for fraudulent inducement, not fraudulent concealment.[94] Fraudulent concealment, unlike fraudulent inducement, requires that the defendant take "some action affirmative in nature designed or intended to prevent, and which does prevent, the

---

[92] *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *11 (Del. Ch. Mar. 28, 2018) (internal quotation marks omitted) (quoting *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015)); *Smith v. Mattia*, 2010 WL 412030, at *5 (Del. Ch. Feb. 1, 2010) ("The elements of fraudulent inducement are the same for those of common law fraud . . . .").

[93] *See Abry P'rs*, 891 A.2d at 1056–57; *H-M Wexford*, 832 A.2d at 142 n.18.

[94] Am. Compl. ¶ 95 ("[T]he release was caused by fraud in the inducement by Momentus."); *id.* at 47 (titling Count IX as "Fraudulent Inducement, in the Alternative").

30

discovery of facts giving rise to the fraud claim."[95]  Because it requires additional proof, it is a different claim.[96]  It was not asserted in the Amended Complaint, and it cannot be asserted for the first time in Kokorich's answering brief.[97]

### 4.    Any Claims Under The May 27 Agreement Were Released.

Kokorich released any claims he had under the May 27 Agreement.  The parties dispute whether the May 27 Agreement falls within the Carveout.  Kokorich argues it was "executed and delivered in connection" with the Stock Repurchase Agreement because the parties had planned to sign both the Stock Repurchase Agreement and National Security Agreement on May 27, but delayed doing so to June 8 only after the May 27 Agreement was signed.  Kokorich's argument,

---

[95] *Transdigm Inc. v. Alcoa Glob. Fasteners, Inc.*, 2013 WL 2326881, at *6 (Del. Ch. May 29, 2013) (internal quotation marks omitted) (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004)).

[96] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 540 (Del. 2011) (reasoning a claim was "a different claim" because "[a] different factual basis supports that claim in the . . . pleadings"); *cf. Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *16 (Del. Ch. Aug. 28, 2012) (reasoning claims were not duplicative in part because the "necessary proofs" required by each may diverge).  A plaintiff may not simply recast her claim for fraudulent inducement as a claim for fraudulent concealment to circumvent *Abry Partners*.  *See Universal Am. Corp. v. P'rs Healthcare Sols. Hldgs., L.P.*, 61 F. Supp. 3d 391, 400 (D. Del. 2014) ("Universal cannot circumvent *Abry*'s holding by arguing the Defendants neglected to inform Universal that its representations were false. . . . [S]imply characterizing something as an 'omission' does not render the anti-reliance provision a nullity.  The Court's discussion in *TransDigm* concentrated on 'concealment.'  If Universal chooses to replead the fraud complaints, it would be well-advised to focus its allegations similarly." (discussing *Transdigm*, 2013 WL 2326881, at *1)).

[97] *Enzolytics, Inc. v. Empire Stock Transfer Inc.*, 2023 WL 2543952, at *4 (Del. Ch. Mar. 16, 2023) ("[B]riefs do not amend pleadings.").

interpreting the Carveout to include "other agreements executed and delivered in connection" with the Stock Repurchase Agreement not on the date it was actually signed, but rather on the date the parties at one point intended to sign it, relies on extrinsic evidence,[98] and so requires the Carveout to be ambiguous.[99]

"Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[100] "When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."[101] "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[102] But, "[i]f, after applying these canons of contract interpretation, the contract is nonetheless 'reasonably susceptible [to] two or more interpretations or may have two or more

---

[98] *See Emerging Eur. Growth Fund, L.P. v. Figlus*, 2018 WL 6446467, at \*5 (Del. Ch. Dec. 10, 2018) (stating "the history of negotiations" are extrinsic evidence).

[99] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[100] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at \*5 (Del. Ch. Apr. 29, 2005)).

[101] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[102] *Eagle Indus.*, 702 A.2d at 1232.

different meanings,' then the contract is ambiguous and courts must resort to extrinsic evidence to determine the parties' contractual intent."[103]

Kokorich urges the Court to consider extrinsic evidence of when the parties originally intended to sign the Stock Repurchase Agreement. But he appears to agree with Momentus that the phrase "executed and delivered in connection herewith" contemplates that the agreement at issue be executed and delivered contemporaneously with the execution of the Stock Repurchase Agreement.[104] This interpretation is reasonable and consistent with at least one other decision from this Court,[105] and I see no other reasonable interpretation. Kokorich points to no other ambiguous language that would open the door to the extrinsic evidence he offers to

---

[103] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 (Del. 2019) (second alteration in original) (footnote omitted) (quoting *Kaiser Alum. Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996)).

[104] *See* D.I. 41, at Br. at 33 [hereinafter "DOB"] (arguing the May 27 Agreement falls outside the scope of the Carveout because it was signed "nearly two weeks prior to the execution of the National Security Agreement and Stock Repurchase Agreement"). Kokorich argues that the Court should treat the May 27 Agreement as if it were signed the same day as the National Security Agreement and the Stock Repurchase Agreement. PAB at 36–37 (arguing that the May 27 Agreement was executed and delivered in connection with the National Security Agreement and Stock Repurchase Agreement because the parties intended to sign all three on May 27).

[105] *See Beal Bank, SSB v. Lucks*, 1999 WL 413356, at *8 (Del. Ch. June 11, 1999) ("The Assignment of Rent is a contemporaneous document executed as added security for the 1985 Mortgage. The Lucks signed it the same day as the 1985 Mortgage and delivered them to Second National. Consequently, it is executed and delivered in connection with the 1985 Mortgage . . . .").

expand the meaning of "executed and delivered in connection herewith." That language is unambiguous and must be interpreted according to its plain terms.[106]

Under the Carveout's plain terms, the May 27 Agreement does not qualify as an agreement "executed and delivered in connection" with the Stock Repurchase Agreement. The May 27 Agreement was executed nearly two weeks before the Stock Repurchase Agreement. Kokorich does not argue any other connection to the Stock Repurchase Agreement. Momentus has demonstrated the May 27 Agreement does not fall within the Carveout. Kokorich released any claims he has under the May 27 Agreement.

### 5. Kokorich Has Failed To Plead A Right To Indemnification Under The Charter.

Kokorich has failed to plead any claim for indemnification under the Charter. Kokorich has not provided the Court with the Charter, nor does his answering brief give any voice to an argument that he is entitled to indemnification under the Charter—it does not even mention the Charter. His failure to attach the Charter, or even describe its contents,[107] together with, and independent of, his failure to make

---

[106] *Eagle Indus.*, 702 A.2d at 1232.

[107] *Cf. Enzolytics*, 2023 WL 2543952, at *3 ("At the pleading stage of a written contract dispute, Rule 8 requires the plaintiff to take the basic and customary step of producing the agreement and citing to the provisions alleged to have been breached. Failure to do so 'is not a technical foot fault; it reflects, instead, a fundamental failure to give the [defendant] fair notice of the claim asserted against [him] as required by [] Rule 8.'" (alterations in original) (footnote omitted) (quoting *Ryan v. Buckeye P'rs, L.P.*, 2022 WL 389827, at *6 (Del. Ch. Feb. 9, 2022), *aff'd*, 285 A.3d 459 (Del. 2022) (TABLE))).

any case as to why he is entitled to indemnification under the Charter, mandates dismissal.[108]

> **6. Kokorich Does Not Have A Right To Indemnification Under Section 145(c) For Fees And Expenses Relating To The CFIUS Investigation.**

Moving from Kokorich's claims under his numerous agreements and correspondence with Momentus, I now turn to his claim that Momentus violated Section 145(c) by refusing to indemnify him for fees and expenses incurred in connection with the CFIUS Investigation. Kokorich seeks immediate payment of indemnification under Section 145(c) as to the CFIUS Investigation, which is the only proceeding that has been completed to date.[109] Section 145(c) provides for mandatory indemnification:

---

[108] *Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived."). Although the burden typically rests with the defendant to show that a plaintiff is not entitled to mandatory indemnification, Kokorich's failure to attach the charter precludes the Court from finding that it includes any mandatory right to indemnification or advancement. *See Stockman*, 2009 WL 2096213, at *13 (explaining defendants have the burden of establishing a plaintiff is not entitled to mandatory indemnification).

[109] Am. Compl. ¶¶ 87–89.

To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.[110]

A plaintiff is "successful on the merits or otherwise" when she avoids an adverse result.[111] To determine whether the result was adverse, the Court compares the possibilities faced with the outcome achieved.[112] Where a plaintiff seeks mandatory indemnification under Section 145(c) or under an equivalent contractual provision, the defendant bears the burden of establishing that the plaintiff is not entitled to indemnification.[113]

Momentus argues that Kokorich was not "successful on the merits or otherwise" with regard to the CFIUS Investigation because he ultimately divested

---

[110] 8 *Del. C.* § 145(c)(1).

[111] *Hermelin*, 54 A.3d at 1110; *Waltuch v. Conticommodity Servs., Inc.*, 88 F.3d 87, 96 (2d Cir. 1996) ("Escape from an adverse judgment or other detriment, for whatever reason, is determinative. According to *Merritt*, the only question a court may ask is what the result was, not why it was." (citing *Merritt–Chapman & Scott Corp. v. Wolfson*, 321 A.2d 138 (Del. Super. 1974))).

[112] *Hermelin*, 54 A.3d at 1110.

[113] *See Stockman*, 2009 WL 2096213, at *13; *see also Horne v. OptimisCorp*, 2017 WL 838814, at *3 (Del. Ch. Mar. 3, 2017) ("This burden upon the party opposing summary judgment is particularly appropriate when a non-moving defendant is resisting a claim for mandatory indemnification under 8 *Del. C.* § 145(c) because the ultimate burden of proof is on the defendant corporation to prove that the indemnitee is not entitled to indemnification.").

his interest in the Company to resolve it.[114] Kokorich contends he was successful because his resignation and divestment of his equity interest allowed Momentus to "carr[y] out its business goals," which is "better than a scenario where Momentus' operations are hamstrung or stall altogether due to ongoing government investigations or other action resulting in the destruction of Momentus' value."[115]

But the focus is on Kokorich's outcome, not Momentus's.[116] Indeed, "'taking one for the team' and 'falling on one's sword' do not equate to 'success on the merits or otherwise' for the indemnitee."[117] A best-case scenario for Kokorich would be a finding by CFIUS that its concerns were unfounded, allowing Kokorich to continue to hold Momentus equity. Instead, the CFIUS Investigation resulted in Kokorich divesting his interest in Momentus for "a fraction of the value of his shares."[118] I cannot say whether this was the worst possible outcome for Kokorich, but it is

---

[114] DOB at 35–36.

[115] PAB at 44.

[116] *Hermelin*, 54 A.3d at 1110 ("I find irrelevant the fact that Hermelin purportedly gave up his right to appeal his exclusion and divested himself of his KV stock in return for the [Office of Inspector General's] promise not to exercise permissive exclusion of KV. Hermelin argues that equity should mandate indemnification in this context, but his right to indemnification, if it exists, arises from statute and contract, not equity.").

[117] *Id.*

[118] PAB at 44.

certainly not a success.[119]  Kokorich has not achieved success on the merits or otherwise, and therefore is not entitled to indemnification under Section 145(c).

### 7. Kokorich's Remaining Claims For Mandatory Indemnification Are Unripe.

Having found Kokorich was not successful on the merits or otherwise with regard to the CFIUS Investigation, the only remaining claims for indemnification under Section 145(c) are requests for declaratory judgments that Kokorich has not released his rights relating to various ongoing proceedings.  This Court will not hear unripe claims.[120]  In determining whether a claim is ripe,

---

[119] *See Hermelin*, 54 A.3d at 1109 (concluding plaintiff was not successful on the merits or otherwise with regard to federal regulatory investigation, where the government imposed an effective lifetime ban but no monetary fine, and the worst-case outcome was an actual lifetime ban).

[120] *Feldman v. AS Roma SPV GP, LLC*, 2021 WL 3087042, at *10 (Del. Ch. July 22, 2021) ("If a claim is moot or not ripe, the Court cannot assert subject matter jurisdiction over it." (citing *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989); and then *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. 2006))); *Solak v. Sarowitz*, 153 A.3d 729, 736 (Del. Ch. 2016) ("The ripeness doctrine prevents Delaware courts from exercising jurisdiction over disputes where doing so would result in the rendering of an advisory or hypothetical opinion . . . ."); *K&K Screw Prods., L.L.C. v. Emerick Cap. Invs., Inc.*, 2011 WL 3505354, at *9 (Del. Ch. Aug. 9, 2011) ("Ripeness refers to whether a suit has been brought at the correct time.  It is essential for a controversy to be justiciable and, therefore, for the Court to have subject matter jurisdiction over it.").

> The Court will weigh the interests of the party seeking relief in obtaining a prompt resolution of the question at issue, including the harm that would be suffered if the Court waits to hear the dispute, on one hand, and the conservation of limited judicial resources and the risk of granting an unsound judgment by ruling on a procedurally or factually premature dispute, on the other.[121]

Claims for indemnification become ripe after there has been a "final, non-appealable judgment."[122] Additional ripeness concerns arise in the context of Section 145(c), as it provides for indemnification rights only where the indemnitee was "successful on the merits or otherwise."[123]

Kokorich's argument as to why he has not released his claims under Section 145(c), though cursory, relies on both this Court's jurisprudence addressing the waiver of mandatory statutory rights, and policy concerns underlying Section 145. The proceedings underlying these claims are not yet resolved, and the Court cannot determine whether Kokorich was successful in defending against ongoing proceedings. Resolving Kokorich's claims now would be a poor use of judicial resources, given an adverse outcome in the underlying proceedings would be

---

[121] *Nask4Innovation Sp. Z.o.o. v. Sellers*, 2022 WL 4127621, at *4 (Del. Ch. Sept. 12, 2022).

[122] *See Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *20 (Del. Ch. Sept. 10, 2018); *Huff v. Longview Energy Co.*, 2013 WL 4084077, at *2 (Del. Ch. Aug. 12, 2013) ("Under settled principles of Delaware law, 'indemnification claims do not typically ripen until after the merits of an action have been decided, and all appeals have been resolved.'" (quoting *Hampshire Gp. Ltd. v. Kuttner*, 2010 WL 2739995, at *53 (Del. Ch. July 12, 2010))).

[123] 8 *Del. C.* § 145(c)(1).

outcome-dispositive.[124]  The present briefing on these questions is insufficient, and their resolution would require supplemental briefing.  For example, neither party has cited a case in which this Court has found a director or officer released her right to indemnification under Section 145(c).  Supplemental briefing would needlessly delay resolution of Kokorich's other claims and impose additional costs.  Kokorich has identified no hardship he would face if his claims were to be addressed once the proceedings end:  indeed, his entitlement to indemnification cannot be determined until they end.[125]  Kokorich's requests for declaratory judgments that he has not released his claims under Section 145(c) are dismissed as unripe.

## III.  CONCLUSION

For the foregoing reasons, Momentus's motion to dismiss under Rule 12(b)(1) is **DENIED**.  Its motion under Rule 12(b)(6) is **GRANTED**.

---

[124] *See Simon v. Navellier Series Fund*, 2000 WL 1597890, at *9 (Del. Ch. Oct. 19, 2000) ("As a matter of litigative efficiency, it makes little sense for this court to decide claims for indemnification—as opposed to claims for advancement of litigation expenses—in advance of a non-appealable final judgment.").

[125] *See Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1241 (Del. Ch. 1987) (concluding the plaintiff would "be required to bear no hardship if it must await the filing of a derivative claim to litigate its assertion").